## Al Baraka Bancorp (Chicago), Inc. v. Munhib Hilweh, the Hilweh Enterprises Corp., and Norstar Bank of Upstate New York, Inc.

[656 A.2d 197]

No. 93-593

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed December 16, 1994

Motion for Reargument Denied January 5, 1995

*Donald J. Rendall, Jr.* of *Sheehey Brue Gray & Furlong P.C.*, Burlington, and *Jeffrey B. Lieberman* and *John J. Sikora, Jr.* of *Barak, Ferrazzano, Kirschbaum & Perlman*, Chicago, Illinois, for Plaintiff-Appellant.

*George A. Michak* of *Eckert Seamans Cherin & Mellott*, Harrisburg, Pennsylvania, *Gregory S. Mertz* of *McCormick, Fitzpatrick & Mertz, P.C.*, Burlington, and *David J. Wukitsch* of *McNamee, Lochner, Titus & Williams, P.C.*, Albany, New York, for Defendant-Appellee.

**Dooley, J.** This is a mortgage foreclosure action in which two competing mortgagees—Al Baraka Bancorp (Chicago), Inc., plaintiff, and Norstar Bank of Upstate New York, Inc., defendant—are seeking to reach mortgaged property in Colchester, Vermont. The mortgagor, The Hilweh Enterprises Corp. (HEC) of Plattsburg, New York, did not contest foreclosure and has not appeared here. Plaintiff initiated this action, relying on HEC's default in making payments pursuant to an agreement, bond, and mortgage and named defendant as an

inferior mortgagee. Defendant filed an answer, counterclaim, and cross-claim for foreclosure, arguing in part that plaintiff's mortgage is unenforceable because it does not secure lawful indebtedness. The trial court granted defendant's motion for summary judgment on the counterclaim, awarding it a foreclosure judgment, and dismissed plaintiff's foreclosure complaint. Plaintiff has appealed. We affirm.

Plaintiff and HEC entered into two financial agreements, each evidenced by three documents: the Agreement, the Bond, and the Mortgage. In the first in October 1989, plaintiff provided HEC $1,400,000. In the second in October 1990, plaintiff increased the amount paid to HEC by $217,000 to a total of $1,617,000. The documents in the second transaction are modifications of those in the first agreement to reflect the additional amount of money. It is appropriate to treat the agreements together as one transaction.

In the Agreement, plaintiff agreed to tender a total of $1,617,000 in exchange for 231 shares of nonparticipatory preferred shares in HEC, and a non-interest-bearing bond in the amount of $1,617,000, secured by a mortgage on Vermont property. The shares entitled plaintiff to receive cumulative dividends at a rate of 14% out of any surplus or net profits of the corporation before common shareholders could receive dividends. Although the preferred stock did not generally confer voting rights, approval of a majority of preferred shareholders (consisting only of plaintiff) is required for selling assets outside the normal course of business, issuing additional stock, borrowing funds, and making loans and like transactions. HEC had the right to redeem the preferred shares at $7,000 per share at any time if funds were available. It was obligated to redeem all the preferred shares by October 4, 1991 (at a total redemption value of $1,617,000) and to pay all dividends that had accumulated until that time. By mutual written agreement, the redemption period could be extended another two years. The Agreement also included an "equity kicker" allowing plaintiff to convert its preferred shares to common shares on a one-for-one basis. If shares were converted or redeemed, the principal amount would decrease $7,000 per share; thus, if all 231 preferred shares were either converted or redeemed, the principal would be reduced to zero.[1]

---

[1] Reduction of the value of the principal due on the Bond upon conversion of shares is expressly provided for in the Agreement. Plaintiff admitted in its memorandum in opposition to defendant's motion for summary judgment, in the affidavit of Chari Aweidah, plaintiff's Vice-President, and in the affidavit of Khaled Sinno, former

The Bond, which is expressly subject to the terms of the Agreement, obligated HEC to pay to plaintiff the full sum of $1,617,000 on or anytime before October 6, 1991, two days after the deadline for redemption of the preferred stock. The Bond is subject to the terms of the agreement. It authorizes HEC to prepay "the indebtedness" in whole or in part provided that dividends under the Agreement had been paid in full through the date of prepayment. An acceleration clause in the Bond states that the full sum plus dividends would become due, at plaintiff's option, if HEC defaulted in the payment of any installment of principal or dividend due under the Agreement.

The Mortgage states that HEC is "justly indebted" to plaintiff under the Agreement for "indebtedness" in the amount of $1,617,000, as evidenced by the Bond. The Mortgage secures the payment of the principal sum and dividends pursuant to the Agreement and the Bond, the performance of covenants and agreements, and any "other indebtedness" of HEC to plaintiff.

There is no dispute about the documents comprising the arrangement between plaintiff and HEC; only their proper interpretation is at issue. Although there was some initial skirmishing about the fact, we also take it as undisputed that HEC is insolvent.[2]

Defendant argues from the documents and the fact of HEC's insolvency that there is no longer an obligation for HEC to pay plaintiff and, therefore, the Mortgage cannot be enforced. Defendant's argument is based primarily on § 513(a) of the New York Business Corporation Law, which allows a corporation to "redeem its redeemable shares . . . except when currently the corporation is insolvent or would thereby be made insolvent." N.Y. Bus. Corp. Law § 513(a) (McKinney 1986). It views the statute as simply an application of the basic principle that a stockholder, as opposed to a creditor, is owed nothing when the corporation becomes insolvent. It argues

---

Vice-President of plaintiff, that redemption or repurchase of the shares also would reduce the principal on the Bond at a rate of $7,000 per share redeemed.

[2] Based on the pleadings and affidavits presented by the parties, the trial court assumed that HEC's insolvency was not at issue. The trial court gave the parties ten days following its decision to raise an objection and file evidence if either party disputed insolvency; neither party filed any evidence. Although plaintiff asserted in its brief that it disputed HEC's insolvency, as part of its argument that summary judgment was premature, it admitted at oral argument in this Court that it was not asking for a trial solely for a determination of insolvency.

There was no finding of the date of HEC's insolvency and no evidence upon which to make a finding. Plaintiff has not claimed that the date of HEC's insolvency is relevant to any of the issues before us. Accordingly, we have assumed HEC was insolvent at all relevant times.

that plaintiff is a stockholder, not a creditor, whose only enforceable right under the Agreement was to have the preferred stock redeemed, and this right was extinguished on insolvency.

Plaintiff disputes defendant's claims for the arrangement between it and HEC, characterizing it as a loan rather than an equity investment. Thus, it views HEC's insolvency as irrelevant to the existence of an underlying "debt" which can be enforced by mortgage foreclosure.

On defendant's motion for summary judgment, based on the undisputed transaction documents and certain affidavits described below, the trial court granted judgment to defendant, concluding that plaintiff was a stockholder in HEC, not a creditor, and no debt existed to be enforced by the Mortgage.

■ Before we reach the heart of the matter, we dispose of three collateral issues if only to note their existence or indicate why they are not determinative. The first is the question of which state's law applies to this dispute. The Mortgage Security Agreement between plaintiff and HEC attempted to answer that in part by providing that the Mortgage and Agreement "shall be construed, interpreted and governed by the laws of the State of Illinois," except where the mortgaged premises are located in another state "the enforcement hereof against the premises . . . and remedies therefor, shall be governed by the laws of the jurisdiction in which the premises . . . are located." We interpret this to mean that questions of the interpretation of the documents between plaintiff and HEC are to be determined under Illinois law and issues related to mortgage foreclosure are to be determined by Vermont law. We see no reason why this provision is invalid. See Restatement (Second) of Conflict of Laws § 187 (1971). The parties have not indicated how Illinois law bearing on contract interpretation is different from that of Vermont. Thus, we have relied on Vermont contract law where indicated.

■ The determinative questions in this case, however, actually relate to a different area of the law, not addressed in the Agreement, that is, the powers and duties of a business corporation. The parties agree that New York law controls these questions because HEC is a New York corporation. This conclusion is consistent with choice of law principles. See *id.* §§ 302(2), 303.

Second, the trial court accepted defendant's argument that it could stand in HEC's position for purposes of contesting the obligation to pay plaintiff and the validity of the mortgage, and plaintiff has not

challenged this conclusion. Thus, once the trial court concluded there was no longer a debt upon which plaintiff could predicate an action for foreclosure, it assumed that the proper remedy was to dismiss plaintiff's foreclosure action. *Retrovest Assocs. v. Bryant*, 153 Vt. 493, 500, 573 A.2d 281, 285 (1990). We have not reexamined this assumption.

Third, in opposition to the motion for summary judgment, plaintiff submitted affidavits of its employees stating that plaintiff intended the transaction with HEC to be a loan. For example, the affidavit of Chari Aweidah, Vice-President of plaintiff, states that the transaction with HEC was a loan of money but was structured differently because plaintiff, a subsidiary of a Saudi Arabian partnership, must comply with Islamic law, which forbids the charging of interest. Plaintiff argues that at a minimum these affidavits should defeat summary judgment because they show the real intent of the contracting parties.

The requirements for summary judgment are familiar. It is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, after giving the benefit of all reasonable doubts and inferences to the nonmoving party. See *State v. Delaney*, 157 Vt. 247, 252, 598 A.2d 138, 141 (1991); V.R.C.P. 56(c). There is no genuine issue for trial, however, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.'" *Kelly v. Town of Barnard*, 155 Vt. 296, 305 n.5, 583 A.2d 614, 619 n.5 (1990) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The standard on review by this Court is the same as the standard applied by the trial court in ruling on the motion. See *Cavanaugh v. Abbott Lab.*, 145 Vt. 516, 520, 496 A.2d 154, 157 (1985).

We agree with the trial court that the affidavits do not create a doubt or contrary inference in the face of unambiguous documents describing the transaction between plaintiff and HEC. Nor by themselves do they create an ambiguity. They are merely self-serving statements of law, not fact. See *Lussier v. Truax*, 161 Vt. 611, 612, 643 A.2d 843, 844 (1993) (defendants' affidavits and documents, submitted in opposition to motion for summary judgment and consisting mainly of opinions as to legal nature of parties' transaction, were insufficient to create genuine issue of material fact that lease agreement was in fact financing agreement); *Osborn v. Osborn*, 159 Vt. 95, 100-01, 614 A.2d 390, 394 (1992) (trial court properly refused to consider attorney's affidavit as to what settlement agreement meant because attorney's opinion was at variance with wording of agreement).

154

■ Having disposed of these threshold issues, we consider the merits and specifically plaintiff's claims that the documents show the presence of a debt or are sufficiently ambiguous that summary judgment was inappropriate. It is helpful on these issues to begin with the operative statute, New York Business Corporation Law § 513(a). It has been interpreted to mean that "any agreement by an insolvent corporation to repurchase its own stock is unenforceable." *Gold v. Lippman (In re Flying Mailmen Serv., Inc.)*, 402 F. Supp. 790, 793 (S.D.N.Y. 1975), *aff'd*, 539 F.2d 866 (2d Cir. 1976). As a logical extension of this interpretation, any security interest created to secure a stock repurchase agreement also becomes unenforceable once the corporation is insolvent. See *In re Dino & Artie's Automatic Transmission Co.*, 68 B.R. 264, 269 (Bankr. S.D.N.Y. 1986). "'Any other result would permit evasion of the statutory rule restricting a corporation's power to repurchase its own shares.'" *Id.* (quoting *Reiner v. Washington Plate Glass Co.*, 711 F.2d 414, 417 (D.C. Cir. 1983)).

■ Because the Agreement contemplated that plaintiff would obtain the return of the money provided to HEC through the repurchase of the preferred stock, there can be no question that this central term of the Agreement is now unenforceable. Plaintiff does not seriously contest this conclusion. Instead, it argues that the Bond and the Mortgage operate independently of the Agreement to create and enforce a debt obligation between HEC and plaintiff. Since the Mortgage operates to secure an obligation created elsewhere, the "debt" must come from the Bond, if anywhere.

The Bond is the source of conflicting arguments in part because its terms are incomplete. It creates an unconditional promise to pay the amount advanced by plaintiff, together with accrued dividends, due two days after the obligation arises for HEC to repurchase the preferred stock. Although the Bond does not state that it is discharged by the full stock repurchase contemplated by the Agreement, the Bond does state generally that it is subject to the terms of the Agreement. The affidavits discussed above attempt to explain the relationship between the Agreement and the Bond. For example, the affidavit of plaintiff's vice-president states:

Although the Agreement . . . [is] not specific on this point, it was also [plaintiff's] understanding that if HEC redeemed the Preferred Stock or paid [plaintiff] for the preferred stock pursuant to a liquidation or dissolution of HEC, any such payments to

[plaintiff] would reduce, dollar for dollar, the indebtedness of HEC to [plaintiff] under the Bond. Under *no circumstances did* [plaintiff] believe that it was entitled to be paid both under the Bond and receive the redemption or liquidation value of the Preferred Stock.

With this clarification, the obligation to pay stated in the Bond is entirely conditional, arising only on a breach of HEC's obligation under the Agreement.

■ The trial court concluded that despite the layers of instruments, the contractual arrangement between HEC and plaintiff should be viewed as an obligation to repurchase the preferred stock for the amount advanced by plaintiff and security for that obligation. Since the underlying obligation became invalid with the insolvency of HEC, the security could not create a new and different obligation. Assuming this construction of the contracts, we agree with the trial court's conclusion. As noted above, the cases applying § 513(a) of the New York Business Corporation Law have invalidated not only the stock redemption contract of an insolvent corporation but also any "security interest guaranteeing that obligation." *Gold*, 402 F. Supp. at 792. The closest case to this is the Bankruptcy Court decision in *In re Dino & Artie's Automatic Transmission Co.*, where the court held that a mortgage securing a bond which reflected the corporation's obligation to repurchase its stock was unenforceable against an insolvent corporation even though the mortgage itself did not indicate that it secured a stock repurchase obligation. 68 B.R. at 269. In that case, the corporation had a stock repurchase agreement with its president, who died before the repurchase right was exercised. Thereafter, the agreement was restructured with the president's widow, who was given a note for a reduced amount and two mortgages to secure the repurchase obligation. The court noted that the effect of the mortgage was to secure an obligation arising under a corporate stock repurchase agreement. *Id.* at 268. Since the underlying obligation to repurchase stock was unenforceable against the insolvent corporation under New York Business Corporation Law § 513(a), the court held that the mortgage securing that obligation was also unenforceable. *Id.* at 269.

Plaintiff argues, however, that the court's construction was wrong or, alternatively, was based on a disputed issue of material fact that prevents reaching this construction on summary judgment. This argument, in turn, depends on the threshold question of whether the

contracts are ambiguous. See *Thomas v. Farrell*, 153 Vt. 12, 16, 568 A.2d 409, 411 (1989) (first responsibility is to determine whether ambiguity exists). This is a question of law. See *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575, 577, 556 A.2d 81, 83 (1988). "'If a contract, though inartfully worded or clumsily arranged, fairly admits of but one interpretation, it may not be said to be ambiguous . . . .'" *Id.* at 580-81, 556 A.2d at 85 (quoting *Allstate Ins. Co. v. Goldwater*, 415 N.W.2d 2, 4 (Mich. Ct. App. 1987)). Where the language is not ambiguous, we apply the plain meaning of the terms used. See *In re New England Tel. & Tel. Co.*, 159 Vt. 459, 466, 621 A.2d 232, 237 (1993).

■  Plaintiff's position is based primarily on the existence of the Bond and Mortgage, the terms in those instruments that reference "indebtedness" or state HEC is "indebted" to plaintiff, and the intent of the parties to create a loan that was consistent with Islamic Law. This position is really a debate with the statute as it has been interpreted. HEC's underlying obligation was to pay money in return for shares; documents that create remedies for nonpayment on this obligation can fairly characterize HEC, after default, as indebted to plaintiff. Irrespective of the characterization, § 513(a) invalidates both the redemption obligation and the contractual remedies and security to enforce it. Similarly, the evidence of plaintiff's intent is really a desire for a different legal effect of the unambiguous transactional documents. To the extent relevant to the legal issue before the court, there was no ambiguity in the documents, and its construction of the contract was correct.

■  Finally, plaintiff argues that summary judgment was premature because it has had insufficient time to complete discovery pertaining to the intent of the parties to the Agreement. We agree that a party opposing summary judgment is entitled to an adequate opportunity to engage in discovery before being required to respond to the motion. See *Chrysler Corp. v. Makovec*, 157 Vt. 84, 91, 596 A.2d 1284, 1288 (1991); *Poplaski v. Lamphere*, 152 Vt. 251, 254-55, 565 A.2d 1326, 1329 (1989). We disagree that there was a deprivation of this right here. In response to this argument, the trial court found that plaintiff failed to go forward with discovery when it had the opportunity, and this finding is supported by the record. More importantly, plaintiff has made no showing that additional discovery could help its position since the decision was rendered on the unambiguous transactional documents to which it is a party.

*Affirmed.*